# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

PAULA VOELLGER,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:17-cv-437

Black, J.

Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Paula Voellger brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for disability insurance benefits ("DIB"). This matter is before the Court on plaintiff's Statement of Errors (Doc. 6), the Commissioner's response in opposition (Doc. 11), and plaintiff's reply (Doc. 12).

## I. Procedural Background

Plaintiff protectively filed her application for DIB in August 2013, alleging disability since June 24, 2013 due to a herniated disc, pinched nerves in her neck, degenerative disc disease, diabetes, fatty liver, acute pancreatitis, renal lithiasis, diabetic nephropathy (hand and feet), degenerative disc disease (lumbar), depression, and anxiety. (Tr. 236). The application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge ("ALJ") Peter J. Boylan. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing held on March 18, 2016. On April 18, 2016, the ALJ issued a decision denying plaintiff's DIB application. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through June 30, 2016.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since June 24, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: Degenerative disc disease; peripheral neuropathy; affective disorder; anxiety disorder; and degenerative joint disease (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, the undersigned finds that the [plaintiff] has the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) except for the following restrictions: She can lift and/or carry 20 pounds occasionally or 10 pounds frequently. She can stand/walk with normal breaks for a total of about four hours during an eight-hour workday. She can sit, with normal breaks for a total of about six hours during an eight-hour workday. She can push or pull within the aforementioned lifting and carrying restrictions. She can occasionally climb ramps or stairs but can never climb ladders, ropes or scaffolds. She can occasionally stoop and kneel. She can frequently crouch and crawl. She should avoid all exposure to hazards, such as unprotected heights and dangerous machinery. She can perform simple, routine tasks. She cannot perform at a production-rate pace, such as generally associated with jobs like assembly line work, but can perform goal-oriented work, such as generally associated with jobs like office cleaner. She can have no fast-paced work. She can make simple, work-related decisions. She is limited to occasional and superficial interaction with supervisors, coworkers and the public. She can tolerate occasional changes in a routine work setting.

6. The [plaintiff] is unable to perform any past work (20 CFR 404.1565).[2]

7. The [plaintiff] was born [in] . . . 1966 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The [plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from June 24, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 63-75).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[2]Plaintiff's past relevant work was as a data entry clerk, a sedentary, semi-skilled job, and as a nurse assistant and a driver, both medium, semi-skilled jobs. (Tr. 74, 106, 289).

[3]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of the representative light unskilled jobs of router, with 400 jobs regionally and 50,000 jobs nationally; mail clerk, with 1,000 jobs regionally and 70,000 nationally; and merchandise marker, with 800 jobs regionally and 150,000 jobs nationally. (Tr. 75, 108).

4

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical evidence

### 1. Physical impairments and limitations

Plaintiff presented at the emergency room in June 2013 with complaints of low back pain. (Tr. 307-15). On examination, plaintiff exhibited full strength, full range of motion in her arms and legs, a normal gait, normal sensation, some right lumbar paraspinal tenderness to palpation, right buttock tenderness, and right lateral thigh tenderness to palpation. She was diagnosed with lumbosacral radiculopathy. (Tr. 312). She was given Flexeril and Norco and told to continue

ibuprofen. (*Id.*). On follow-up at her primary care physician's office on July 2, 2013, physical examination findings of bilateral muscle spasm, decreased range of motion of the back, and reduced deep tendon reflexes were made. Plaintiff was diagnosed with a low back sprain and medication was prescribed. (Tr. 341-43).

Plaintiff visited the emergency room later in July for hypertriglyceridemia and uncontrolled diabetes. (Tr. 336). Her CT scan disclosed a fatty liver, and she was treated with an insulin drip temporarily. Plaintiff followed up with Dr. Gregory Niehauser, D.O., on July 23, 2013 for lower back pain, diabetes, and her hospitalization for pancreatitis. (Tr. 336-40). The treatment notes reflect that her diabetes disease course had "been fluctuating" but there were "no hypoglycemic associated symptoms" or complications, associated symptoms included foot paresthesia, she had nephropathy as a complication of diabetes, and her symptoms were stable. (Tr. 336). A history of degenerative disc disease of the lumbar spine which had been treated with an epidural injection in the past was noted. (Tr. 336-37). No abnormal findings were made on physical examination. (Tr. 337).

On August 1, 2013, plaintiff complained to Dr. Niehauser of neck pain that began after she was injured in a motor vehicle accident 24 years earlier and that was treated by a chiropractor. (Tr. 529). She complained that the pain had worsened over the past several months in the posterior neck, the upper back, out toward the bilateral shoulders, and radiating into the left arm with numbness at times. Plaintiff reported the pain was worse with movement and was severe at times, and she took ibuprofen 800 mg on occasion and used a rolled up towel for support when seated. (*Id.*). On physical examination, plaintiff had pain to palpation of the upper trapezius

muscle without spasm, full flexion but decreased range of motion in all other planes of cervical motion, and reflexes equal and +3/4 bilaterally. (*Id.*).

An MRI of the lumbar spine from August 2013 showed mild degenerative disc disease at L4-L5 and L5-S1 with mild disc herniations at both levels. (Tr. 370). An MRI of the cervical spine showed minimal or mild stenosis at C3-C4, C5-C6, and C6-C7, and the impression was degenerative disc disease with multilevel disc herniation and multilevel spinal stenosis. (Tr. 372). Back and neck x-rays taken in October 2013 showed mild degenerative changes at C3-4, C4-5 and C6-7 and severe degenerative change in the disc at C5-6 with disc narrowing and spurring. (Tr. 319). Other notable cervical findings included no subluxation or abnormal movement with flexion or extension. (*Id.*).

At Dr. Niehauser's request, plaintiff consulted with neurosurgeon Dr. Thomas Saul, M.D., in October 2013 as to the cause on her predominantly left-sided neck pain and left arm paresthesia. (Tr. 316). Plaintiff complained of neck pain that had persisted for "a couple of years" and which had worsened "precipitously" in June of 2013 with more severe pain in the posterior cervical region, primarily on the left side. (Tr. 316). Plaintiff also complained of an aching sensation going into both shoulders and paresthesia down her left arm into the hand and involving the last three digits following a C6/C7 dermatomal distribution. (*Id.*). Dr. Saul had originally referred plaintiff for physical therapy based on her imaging studies and clinical information, which reportedly had not helped her symptoms. (*Id.*). Dr. Saul's examination showed no abnormalities of motor, sensory or reflex functions referable to the cervical spine, spinal cord and/or nerve roots. (Tr. 318). There were no abnormalities as to plaintiff's gait; range of motion of the head, neck, and both arms; deep tendon reflexes of both upper extremities; muscle strength in all muscle

groups of both arms; stability in movement of the neck and arm joints; and muscle tone of the musculature of head and neck, spinal column, and both arms and legs. (Tr. 317). Sensory examination to pinprick and/or fine touch of both arms was normal in all cervical dermatomes bilaterally. (*Id.*). Dr. Saul explained to plaintiff that the herniated cervical disc at C5-6 and on the left side "could certainly be contributing to her symptoms." (Tr. 318). He explained four treatment options to plaintiff: (1) live with her condition and adjust her activities according to the symptoms, (2) physical therapy, (3) epidural steroid injections, or (4) surgery. The mutually agreed upon plan was to avoid surgery at that time and proceed with an injection, have Dr. Saul reevaluate plaintiff two weeks after the injection, and make a decision based on plaintiff's response to the intervention. (*Id.*).

Dr. Niehauser continued to follow plaintiff for hypertension, hyperlipidemia, diabetes checks, back pain, tobacco abuse, depression and anxiety. (Tr. 634-61, 668-721, 732-39). The treatment notes reflect that plaintiff's diabetes remained stable with the associated symptom of foot paresthesia and the complication of nephropathy, and that plaintiff's back pain was stable and controlled with the use of medication. (Tr. 638, 677-709). Dr. Niehauser recommended that plaintiff eat only diabetic chocolate in small amounts and that she start aerobic exercise, and she was strongly encouraged to stop smoking. (Tr. 639-40).

In November 2014, plaintiff reported to Dr. Niehauser that she had discussed symptoms of neck/arm, hand/finger and leg pain with morning stiffness with her sister, and plaintiff complained of bilateral ankle swelling, frequent headaches, trouble sleeping, and poor energy. (Tr. 669). Dr. Niehauser evaluated plaintiff for possible fibromyalgia. (Tr. 668). On physical examination, Dr. Niehauser made a finding of "[m]ultiple trigger points noted in the upper trapezius muscle

bilaterally" and assessed fibromyalgia. (Tr. 668-70). Dr. Niehauser noted that Flexeril and Norco worked well to control her back pain. (Tr. 669). He recommended regular aerobic exercise prior to starting fibromyalgia medication. (Tr. 670).

### 2. Mental impairments

Plaintiff was treated by Dr. Niehauser's office for depression and anxiety with psychotropic medication. In July 2013, plaintiff's psychiatric/behavioral findings were negative. (Tr. 341). Plaintiff was taking Xanax as needed for anxiety and felt that "the medication works well when taken." (Tr. 337). She was tolerating and compliant with Prozac for depression, which she felt was working well. (*Id.*). In November 2013, plaintiff had not had Xanax recently, although she felt that the medication worked well to control her anxiety when taken. (Tr. 638). She reported she was more depressed lately with poor motivation, insomnia, anxiety, social withdrawal, emotionality and stress due to her mother's declining health. She denied any suicidal ideation and reported she had been put on Trazadone in the past but did not like the way it made her feel. Dr. Niehauser discontinued Prozac and gave her samples of Pristiq 50 mg once daily; diagnosed her with depression; and referred her to counseling with Dr. Diehl. (Tr. 640). In January 2014, Dr. Niehauser informed plaintiff insurance would not cover Pristiq and they recommended Effexor; but plaintiff was hesitant to switch from Pristiq because it was working very well for her. (Tr. 644). Dr. Niehauser therefore told plaintiff he would keep her supplied with samples as much as possible. (*Id.*). When he next saw plaintiff on March 12, 2014, Dr. Niehauser reported that plaintiff could not see Dr. Diehl as he did not accept Medicaid, plaintiff continued to be depressed and had difficulty leaving the house, she was having panic attacks, she was switching from Pristiq to Effexor that week, and she took Xanax as needed.

Plaintiff saw various therapists at Talbert House beginning in March 2014. Plaintiff's sessions dealt mainly with her relationship with her boyfriend. (Tr. 422-27). Initially, plaintiff had an anxious and depressed mood but she was cooperative with an appropriate affect. (Tr. 427). In June 2014, plaintiff reported to her clinical specialist that her emotions were "running high" following the death of her mother. Plaintiff had a depressed and anxious mood and affect but she spoke clearly and logically. (Tr. 438-41). By March 2015, plaintiff's treatment was discontinued due to non-compliance because her attendance was erratic, she failed to focus on treatment goals, and she failed to take opportunities to work with therapists. (Tr. 726-728).

Plaintiff began treating with psychiatrist Brian Masterson, M.D. in February 2015. Her behavior, judgment, thought content, and speech were normal. Her mood appeared anxious and depressed. Her affect was not labile or inappropriate. Cognition and memory were not impaired. She exhibited normal recent memory and normal remote memory. She expressed no homicidal and no suicidal ideation. She was attentive. Dr. Masterson assessed depression and anxiety and prescribed Effexor, Xanax, and Trazodone. (Tr. 751-52). Plaintiff did not want to see a therapist at that time. (Tr. 752). Plaintiff continued to treat with Dr. Masterson through at least March 2016. (Tr. 740-52). Plaintiff testified that she usually saw him every eight weeks. (Tr. 90-91).

### E. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred in weighing the opinions of the nonexamining medical sources and the consultative examining sources; (2) the ALJ erred by finding that plaintiff's neck impairments, fibromyalgia and diabetes were non-severe impairments and by failing to consider these impairments in combination as required under 20 C.F.R. §

404.1523; (3) the ALJ erred by giving the most weight to the opinions of the nonexamining

medical sources and by failing to incorporate all of the work-related limitations they assessed into

the RFC finding; (4) the ALJ erred in weighing the opinion of plaintiff's treating physician, Dr.

Niehauser; (5) the ALJ erred in evaluating plaintiff's subjective allegations; and (6) the ALJ erred

at step five of the sequential evaluation process by relying on an improper hypothetical question.

Plaintiff argues that if limited to sedentary work, she is disabled as of January 2016 under Grid

Rule 201.14, Appendix 2, 20 C.F.R. Part 404.   (Docs. 6, 12).

### 1.   Severe impairment finding

The Court initially considers plaintiff's second assignment of error, which challenges the

ALJ's findings at step two of the sequential evaluation process.   Plaintiff alleges the ALJ erred by

finding that her neck impairments, fibromyalgia and diabetes were non-severe impairments.   The

Commissioner argues that the ALJ reasonably determined that plaintiff's diabetes and

fibromyalgia were not severe impairments and that the ALJ appropriately considered plaintiff's

neck impairments at step two of the sequential evaluation process.   The Commissioner argues that

in any event, the ALJ properly considered all of plaintiff's impairments in formulating her residual

functional capacity ("RFC").

An impairment is considered "severe" unless "the [claimant's] impairment(s) has no

more than a minimal effect on his or her physical or mental ability(ies) to perform basic work

activities."   Social Security Ruling 85-28, 1985 WL 56856, at *3 (1985).[1]   The claimant's

burden of establishing a "severe" impairment during the second step of the disability

---

[1] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner."   *Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 272 n. 1 (6th Cir.

determination process is a "*de minimis* hurdle." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "Under [this] prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.*

The ALJ found that the following physical impairments were "severe impairments" at step two of the sequential evaluation process: degenerative disc disease, peripheral neuropathy and degenerative joint disease. (Tr. 63). The ALJ found that plaintiff had also been diagnosed with diabetes mellitus, fibromyalgia, and gastroesophageal reflux disease. (Tr. 64). However, the ALJ found no indication in the record that these impairments, either singly or in combination, more than minimally impacted plaintiff's ability to perform basic work-related activities. (*Id.*). Plaintiff has not shown that the ALJ's findings were erroneous.

First, plaintiff has not shown that the ALJ erred at step two by failing to find that her fibromyalgia was a severe impairment. Plaintiff alleges that the ALJ's finding is unsupported because (1) Dr. Niehauser made the diagnosis in November 2014 after "trigger point testing" (Tr. 670); (2) the diagnosis is noted on additional treatment records (Tr. 732, 745, 747); and (3) plaintiff also suffered from fatigue and muscle pain. (Doc. 6 at 10). The evidence plaintiff cites is insufficient to support a fibromyalgia diagnosis under Social Security Ruling 12-2p, which provides guidance on how the agency develops evidence to establish that a person has a medically determinable impairment of fibromyalgia and how the agency evaluates fibromyalgia in disability claims. SSR 12-2p, 2012 WL 3104869, at *1 (July 25, 2012). SSR 12-2p describes

---

2010) (quoting 20 C.F.R. § 402.35(b)(1)). The Sixth Circuit has refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same way as Social Security Regulations but has assumed that they are. *Id.* (citing *Wilson,* 378 F.3d at 549).

fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2. Pursuant to the Ruling, "FM [fibromyalgia] is an MDI [medically determinable impairment] when it is established by appropriate medical evidence." *Id.* If a physician diagnoses fibromyalgia, the agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of FM. . . ." *Id.*

The agency will find that a person has a medically determinable impairment of fibromyalgia if a physician diagnosed fibromyalgia and provides the evidence described under § II.A or § II.B of the Ruling, and the physician's diagnosis is not inconsistent with the other evidence in the individual's case record. *Id.* Under § II.A, the agency "may find that a person has an MDI of FM if he or she has all three of the following:

1. A history of widespread pain - that is, pain in all quadrants of the body . . . and axial skeletal pain . . . - that has persisted (or that persisted) for at least 3 months . . . [and which] may fluctuate in intensity and may not always be present.

2. At least 11 positive tender points on physical examination . . . [which] must be found bilaterally . . . and both above and below the waist [in specified locations using a specific testing method]. . . .

3. Evidence that other disorders that could cause the symptoms or signs were excluded. . . ."

*Id.*, at *2-3.

A person may be found to have an MDI of FM under § II.B. if she has all three of the following criteria:

1. A history of widespread pain (see section II.A.1);

13

2. Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue. . . .; and

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded[.]

*Id.*, at *3.

Here, the ALJ found that plaintiff was never given a medically substantiated diagnosis of fibromyalgia. (Tr. 64). The ALJ's finding is supported by the substantial evidence of record. Plaintiff's primary care physician, Dr. Niehauser, saw plaintiff for blood work, a cough, and "possible fibromyalgia" in November 2014. (Tr. 668). On physical examination, Dr. Niehauser found "[m]ultiple trigger points . . . in the upper trapezius muscle bilaterally" and he diagnosed plaintiff with fibromyalgia. (Tr. 670). He recommended that plaintiff perform regular aerobic exercise before starting on "a lot of fibromyalgia medication." (*Id.*). However, there is no indication that plaintiff's trigger point testing results satisfied the requirements of § II.A.2. Dr. Niehauser did not specify the number of trigger points he found on testing or their precise location. Nor do Dr. Niehauser's records indicate that he excluded other conditions that could cause plaintiff's symptoms.

There is no other evidence that substantiates a fibromyalgia diagnosis. It appears that Dr. Niehauser listed the fibromyalgia diagnosis in only one subsequent treatment record approximately one year after the initial diagnosis. (Tr. 732). That treatment note indicates that the follow-up plan was for plaintiff to "[r]eturn in about 3 months . . . for Diabetes" only with no mention of follow-up treatment for fibromyalgia. (Tr. 734). The only other records cited by plaintiff that include a fibromyalgia diagnosis are treatment notes generated by her psychiatrist,

14

Dr. Masterson, who did not perform fibromyalgia testing or make the necessary physical findings to substantiate the existence of a medically determinable impairment under SSR 12-2p. (Tr. 745, 747). There is no evidence that plaintiff received treatment for fibromyalgia from Dr. Niehauser or any other medical provider. Thus, the ALJ was not required to find that fibromyalgia was a severe impairment based on Dr. Niehauser's testing and diagnosis.

The only other evidence plaintiff offers to support her claim that the ALJ was bound to find her fibromyalgia is a "severe" impairment are conclusory allegations that the disease causes her to suffer "fatigue and muscle pain." (Doc. 6 at 10). While both fatigue and muscle pain can be symptoms of fibromyalgia, *see* SSR 12-2p, 2012 WL 3104869, at *3, plaintiff has cited no medical evidence that rules out another medical condition as the source of her symptoms and links her subjective complaints of fatigue and muscle pain to fibromyalgia. Thus, the ALJ did not err by failing to find fibromyalgia was a severe impairment in this case.

Second, plaintiff argues the ALJ erred by failing to find that she suffers from a severe neck impairment. (Doc. 6 at 9). The ALJ found at step two of the sequential evaluation process that she suffers from the severe impairments of degenerative disc disease and degenerative joint disease. (Tr. 63). Further, the ALJ specifically found that plaintiff suffered from cervical spine disc herniations and spinal stenosis. (Tr. 63-64). The ALJ noted that imaging results disclosed cervical spondylosis at several levels of the cervical spine, and Dr. Saul indicated that plaintiff's complaints of neck and shoulder pain corresponded with abnormalities at these levels. (*Id.*, citing Tr. 319, 316). Plaintiff acknowledges that the ALJ found degenerative disc and joint disease at step two, but she argues that the ALJ erred by failing to include restrictions in the RFC finding to specifically account for a herniated cervical disc, cervical spondylosis, and neck and arm pain.

(*Id.*, citing Tr. 318-20, 372, 419, 444-45, 691, 703-04). This allegation of error does not challenge the ALJ's severe impairment finding but instead goes to whether the ALJ properly accounted for the functional limitations assessed by the medical sources and properly evaluated plaintiff's subjective complaints regarding her symptoms and functional limitations at later steps of the sequential evaluation process. The ALJ did not err at step two of the sequential evaluation process by failing to include plaintiff's neck as a severe impairment.

Finally, plaintiff alleges that the ALJ erred by failing to include "diabetes" among her severe impairments. The ALJ acknowledged that plaintiff was diagnosed with diabetes mellitus but found that plaintiff's condition has "remained stable and controlled most of the time." (Tr. 64, citing Tr. 321, 336, 344, 350, 354, 677, 690). Plaintiff argues that her diabetes was not well-controlled based primarily on laboratory results she cites. (*See* Tr. 374, 376, 391, 394, 652, 654, 672, 679-80, 694, 706). However, plaintiff does not point to any treatment records that interpret the data and contradict Dr. Niehauser's reports that her disease course had remained stable with no hypoglycemic complications. Further, plaintiff does not allege, and the records do not show, that plaintiff's diabetes caused functional restrictions other than neuropathy, which the ALJ recognized and found to be a severe impairment. To the contrary, Dr. Niehauser reported in April 2014 and March 2015 that plaintiff's

> disease course has been stable. Associated symptoms include chest pain, polydipsia and polyuria. Pertinent negatives for diabetes include no foot paresthesias and no foot ulcerations. . . . There are no hypoglycemic complications. Symptoms are stable. Diabetic complications include nephropathy. . . .

(Tr. 652, 677). Thus, the ALJ did not err by failing to find diabetes was a severe impairment.

16

Even if the ALJ erred by failing to find diabetes, fibromyalgia or plaintiff's neck condition was a severe impairment in plaintiff's case, the error was harmless. An ALJ's failure to find a severe impairment where one exists may not constitute reversible error where the ALJ determines that a claimant has at least one other severe impairment and continues with the remaining steps of the disability evaluation. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). This rule is predicated on the notion that the ALJ "properly could consider [the] claimant's [non-severe impairments] in determining whether [the] claimant retained sufficient residual functional capacity to allow [her] to perform substantial gainful activity." *Id.* In this case, the ALJ determined that plaintiff's severe physical impairments included degenerative disc disease, degenerative joint disease, and peripheral neuropathy, and the ALJ continued to conduct a meaningful analysis of how plaintiff's severe impairments impacted her physical functioning. (Tr. 63-64, 67-74). The ALJ adopted these restrictions to account for plaintiff's functional limitations resulting from her physical impairments:

> She can lift and/or carry 20 pounds occasionally or 10 pounds frequently. She can stand/walk with normal breaks for a total of about four hours during an eight-hour workday. She can sit, with normal breaks for a total of about six hours during an eight-hour workday. She can push or pull within the aforementioned lifting and carrying restrictions. She can occasionally climb ramps or stairs but can never climb ladders, ropes or scaffolds. She can occasionally stoop and kneel. She can frequently crouch and crawl. She should avoid all exposure to hazards, such as unprotected heights and dangerous machinery.

(Tr. 66). Plaintiff has not shown that even if the ALJ was bound to find the non-severe physical impairments discussed above were in fact severe, those impairments imposed any additional functional limitations which the ALJ failed to include in the RFC finding. Because plaintiff has not shown that the record supports the imposition of additional functional limitations to account

17

for her diabetes, neck impairment, or fibromyalgia, any erroneous assessment of these impairments by the ALJ in this case would be harmless. *See Foster v. Bowen*, 853 F.2d 483, 488-89 (6th Cir. 1988) (relevant consideration in disability case is not claimant's diagnoses, but whether impairments impose disabling limitations).

Plaintiff has not shown that the ALJ erred by failing to find her diabetes, neck impairment, or fibromyalgia were severe impairments. Nor has plaintiff shown that if the ALJ did err, the error was harmful. Plaintiff's second assignment of error should be overruled.

### 2. Weight to the treating physician's opinions

Plaintiff alleges as her fourth assignment of error that the ALJ erred in weighing the opinions of her treating physician, Dr. Niehauser. (Doc. 6 at 12-15). Plaintiff argues that the ALJ erroneously rejected Dr. Niehauser's assessment of debilitating functional limitations and failed to give "good reasons" for discounting Dr. Niehauser's opinions as required under the agency's regulations. (*Id.*).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)).

If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must determine the weight the opinion should be given based on a number of factors, including the length, nature and extent of the treatment relationship and the frequency of examination, as well as the medical specialization of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6); *Gayheart*, 710 F.3d at 376.

"Importantly, the Commissioner imposes on [the SSA's] decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p).

Plaintiff's treating physician, Dr. Niehauser, completed two assessments of plaintiff's physical functioning. The first was a Department of Education certification of disability for discharge of plaintiff's student loan, which Dr. Niehauser completed on July 2, 2014.[2] (Tr. 444-45). He certified that plaintiff had "a medically determinable physical or mental impairment that (a) prevents [her] from engaging in any substantial gainful activity, in any field of work, and (b) can be expected to result in death, or has lasted for a continuous period of not less than 60 months, or can be expected to last for a continuous period of not less than 60 months[.]" (Tr.

---

[2] The Department of Education approved plaintiff's application for discharge of her loan in August 2014. (Tr. 662-63).

444). He listed her diagnoses as depression, anxiety, degenerative disc disease of the lumbar spine and neck, severe anxiety requiring medication and therapy, and severe low back and neck pain. He opined that plaintiff "cannot lift at all," "cannot stand or walk for extended periods," "cannot clean house due to back/neck pain," has "poor physical [and] mental status [and] poor family support," and her "anxiety is worse in social situations," and he assessed a global assessment of functioning (GAF) score of 45.[3] (Tr. 444).

Dr. Niehauser also completed an assessment of plaintiff's physical functioning in December 2015. (Tr. 723-24). He opined that plaintiff can stand/walk less than one-hour total during an eight-hour workday; she can sit a total of 30 minutes during an eight-hour work day; she can lift/carry 6-10 pounds frequently; her ability to reach/handle is moderately limited; her ability to push/pull is markedly limited; and her ability to bend is extremely limited. (Tr. 724). As the bases for his findings, Dr. Niehauser reported that plaintiff suffers from degenerative disc disease of the lumbar spine and neck with moderate chronic pain that is severe at times, decreased range of motion of the lumbar and cervical spines, and severe depression that had its onset "years ago" for which she sees a psychiatrist. (Tr. 723). Dr. Niehauser reported that plaintiff had been referred to pain management, she took multiple medications, and she saw a psychiatrist. (Id.).

The ALJ gave "very little consideration" to Dr. Niehauser's July 2014 assessment that plaintiff could not lift, stand/walk for extended periods of time, or clean her home due to neck and

---

[3] A GAF score represents a clinician's assessment of an individual's overall level of functioning on a scale of 0-100. Diagnostic & Statistical Manual of Mental Disorders, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). A score between 41 and 50 "indicates serious symptoms, and such an individual may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job." *Bobby Carter v. Nancy Berryhill, Acting Comm'r of Soc. Sec.*, No. 1:16-CV-01840, 2017 WL 2544064, at *2, n. 4 (N.D. Ohio May 26, 2017) (Report and Recommendation), *adopted*, 2017 WL 2537066 (N.D. Ohio June 12, 2017) (citing DSM-IV at 34). An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Id.* (citing DSM-V at 16) (American Psychiatric Ass'n, 5th ed., 2013)).

back pain, and his assessment of a GAF score of 45. (Tr. 70, citing Tr. 444-45). The ALJ

expressly declined to give the opinion "controlling weight" because the medical evidence did not

support Dr. Niehauser's findings. (Tr. 70-71). The ALJ found that plaintiff "consistently

exhibited normal clinical signs," including a normal gait and full strength in both upper

extremities, which contradicted the exertional limitations Dr. Niehauser assessed. (Tr. 71).

Further, plaintiff had acknowledged that she performed several household tasks, which was

inconsistent with Dr. Niehauser's finding that back and neck pain prevented her from performing

these activities. (*Id.*). Finally, although Dr. Niehauser assessed a GAF score of 45 based on

suicidal ideation and plaintiff's alleged inability to keep a job, the ALJ found that factors other

than plaintiff's mental impairments or limitations had led plaintiff to threaten suicide at one point

and had prevented her from maintaining a job. (Tr. 71, citing Tr. 422, 426, 427). The ALJ

likewise declined to give Dr. Niehauser's December 2015 assessment "controlling weight"

because plaintiff's activities, which included fishing as recently as 2014 and going to the casino,

and her conservative treatment with non-invasive measures were not consistent with the sitting and

standing restrictions Dr. Niehauser imposed. (Tr. 71-72).

　　　　The record substantially supports the ALJ's findings and his decision to give Dr.

Niehauser's July 2014 and December 2015 assessments less than controlling weight. (*Id.*). The

extreme functional restrictions assessed by Dr. Niehauser are not consistent with his own clinical

findings or with the other medical evidence of record. On examination in the emergency room in

June 2013 for low back pain, plaintiff exhibited full strength, full range of motion in her arms and

legs, a normal gait, and normal sensation with only some right lumbar paraspinal tenderness to

palpation, right buttock tenderness, and right lateral thigh tenderness to palpation. (Tr. 307-15).

On physical examination in August 2013, Dr. Niehauser found that plaintiff had pain to palpation of the upper trapezius muscle without spasm, full flexion but decreased range of motion in all other planes of cervical motion, and reflexes equal and +3/4 bilaterally. (Tr. 529). Clinical findings in October 2013 were largely normal when orthopedist Dr. Saul saw plaintiff on referral by Dr. Niehauser, including gait; range of motion of the head, neck, and both arms; deep tendon reflexes of both upper extremities; muscle strength in both arms; neck and arm joint stability in movement; and sensory examination of both arms in all cervical dermatomes bilaterally. (Tr. 317). These treatment records substantially support the ALJ's finding that Dr. Niehauser's assessment of debilitating sitting, lifting and postural/manipulative restrictions was not well-supported by his clinical findings and was not consistent with the other substantial evidence in the record. 20 C.F.R § 404.1527(c)(2). Thus, the ALJ did not err by giving Dr. Niehauser's opinions less than controlling weight.

Upon finding that Dr. Niehauser's opinions were not well-supported by the clinical and other medical evidence, the ALJ weighed Dr. Niehauser's opinions in accordance with the appropriate regulatory factors: the length, nature, and extent of the treatment relationship and the frequency of examination; the supportability of the opinions and consistency of the opinions with the record as a whole; the medical specialty of Dr. Niehauser; and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c); *Gayheart*, 710 F.3d at 376. The ALJ gave "good reasons" for affording Dr. Niehauser's July 2014 and December 2015 opinions "very little consideration" or "little weight." (Tr. 71). The ALJ found that neither assessment was entitled to much weight because the limitations Dr. Niehauser imposed were not proportionate with the medical evidence, which documented insufficient clinical signs; examination findings

22

consisting of mostly subjective complaints of tenderness and decreased range of motion; diagnostic studies showing only "mild" and "minimal" abnormalities; and plaintiff's conservative treatment history, which included no recent epidural injections, no pain management treatment despite a referral, and one trip to the emergency room for treatment. (Tr. 72). The ALJ found that Dr. Niehauser's own examination findings, which disclosed only a decreased range of motion, did not support the extreme walking and sitting restrictions he assessed in December 2015. (Tr. 71-72, citing Tr. 699, 724). This finding is consistent with the largely normal clinical and examination findings discussed above and supports the ALJ's decision not to credit Dr. Niehauser's assessment.[4] *See Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record.") (citing 20 C.F.R. §§ 404.1527, 416.927; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)).

Further, the treatment notes support the ALJ's finding that plaintiff's pain was managed well with medication. On physical examination in November 2014, Dr. Niehauser noted that Flexeril and Norco worked well to control plaintiff's back pain. (Tr. 669). The treatment notes reflect that throughout 2015, plaintiff's back pain was relatively stable and controlled with the use of medication. (Tr. 677-709). Plaintiff complained of back pain only in December 2015 and had decreased range of motion on physical examination at that time. (Tr. 699). Plaintiff complained of neck and arm or shoulder pain in July, October and December 2015 (Tr. 690, 699, 704), but the

---

[4] The ALJ did not mention that cervical x-rays taken in 2013 showed "severe degenerative change in the disc with disc narrowing and spurring" at C5-6. (Tr. 319). Nonetheless, this imaging result does not support Dr. Niehauser's assessment of walking and sitting restrictions totaling less than two hours of an eight-hour workday. (Tr. 724).

record does not show that she pursued additional treatment options. Dr. Niehauser reported that plaintiff had been referred to pain management (Tr. 723), but there is no indication that she treated with a pain management specialist. Moreover, although plaintiff and Dr. Saul discussed surgery as one of four possible treatment options at her initial consult (Tr. 318), there is no indication in the records that Dr. Saul or any other specialist recommended that plaintiff proceed with surgery for her back or neck impairments. The ALJ reasonably discounted the extreme functional restrictions assessed by Dr. Niehauser based on plaintiff's conservative treatment regimen and her failure to pursue more aggressive treatment. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) (records indicated that the claimant "received only conservative treatment for her ailments," which was a "good reason" for discounting a treating source opinion) (case citations omitted); 20 C.F.R. § 404.1527(c)(2) ("We will look at the treatment the source has provided. . . .").

The ALJ took additional regulatory factors into account in giving Dr. Niehauser's July 2014 opinion "very little consideration" and his December 2015 assessment "little weight." (Tr. 71-72). These factors included Dr. Niehauser's area of specialization. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). The ALJ noted that Dr. Niehauser began treating plaintiff in January 2012 (Tr. 364) and saw plaintiff once every several months; however, he served as her primary care physician who mainly treated her diabetes, hypertension, and hyperlipidemia. (Tr. 71, citing Tr. 321-412, 633-661). Dr. Niehauser prescribed medications for plaintiff's neck and back pain, but he referred plaintiff to Dr. Saul, a neurosurgeon, for her neck and arm issues in 2013 (Tr. 316-20)

24

and he eventually referred plaintiff to a pain management specialist (Tr. 704, 723). (Tr. 71). The ALJ also discounted Dr. Niehauser's assessments because he had limited insight into plaintiff's mental impairments. (*Id*.). The ALJ found that although Dr. Niehauser prescribed psychotropic medications, he does not specialize in mental health and he referred plaintiff to specialists for her mental health issues. (Tr. 71, citing 422-27, 438-41, 442-43, 725-36). The ALJ reasonably discounted Dr. Niehauser's assessments on the ground his area of expertise was not especially pertinent to the restrictions he assessed.

The ALJ thoroughly evaluated Dr. Niehauser's medical opinions and gave "good reasons" for giving Dr. Niehauser's opinions reduced weight. Those reasons are substantially supported by the evidence of record. Plaintiff's fourth assignment of error should be overruled.

### 3. Weight to the examining and nonexamining physicians' opinions

Plaintiff alleges as her first and third assignments of error that the ALJ erred by relying on "material inconsistencies and mistakes of fact" when weighing the opinions of the consultative examining and state agency reviewing medical sources. Plaintiff alleges that the ALJ erred by giving the most weight to the assessments of the nonexamining state agency medical sources and by not incorporating all of the limitations they assessed into the RFC finding.

Under the Social Security regulations, "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence . . . may constitute substantial evidence . . . adverse to the claimant" in a disability proceeding. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (quoting *Richardson,* 402 U.S. at 402). The opinion of a nontreating medical source is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent

25

the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6). The opinion of a nontreating but examining source is generally entitled to more weight than the opinion of a nonexamining source. *Ealy*, 594 F.3d at 514; *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007); 20 C.F.R. § 404.1527(c)(1). Because a nonexamining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a nonexamining source depends on the degree to which the source provides supporting explanations for his opinion and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c).

### i. Physical assessments

The nonexamining state agency physician, Dr. Leon D. Hughes, M.D., reviewed the medical record and completed a physical RFC assessment on April 24, 2014. (Tr. 115-25). He assessed plaintiff as able to lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently; stand/walk approximately four hours in an eight-hour workday; and sit approximately six hours in an eight-hour workday. (Tr. 124). He found that plaintiff could occasionally climb ladders/ropes/scaffolds and ramps/stairs, stoop and kneel, and frequently crouch/crawl. (Tr. 124-25). He restricted plaintiff from commercial driving and exposure to hazardous machinery and unprotected heights due to diabetes with neuropathy. (Tr. 125). The reviewing physician's assessment was affirmed on reconsideration on October 28, 2014. (Tr. 140-42).

The state agency reviewing physicians gave "great weight" to the assessment of consultative examining physician Dr. Martin Fritzhand, M.D. (Tr. 123). Dr. Fritzhand examined plaintiff, reviewed x-rays of her cervical and lumbar spines, and prepared a report in

April 2014 for disability purposes. (Tr. 413-21). He reported that plaintiff complained of low back pain since 2010 which she described as intermittent, sharp, radiating to the hips and legs, and exacerbated by prolonged ambulation or standing and bending, stooping or lifting heavy objects. (Tr. 417). She reported numbness of the right lower leg and foot and occasional instability. Plaintiff reported constant sharp pain of the cervical spine exacerbated by rapid head movements. She took Norco and Flexeril for the pain and Hydrocodone only when she "really, really" needed it. She occasionally used a heating pad and ice but did not use a lumbosacral support. (Tr. 417). Dr. Fritzhand assessed degenerative joint disease with chronic neck pain and chronic low back pain; Type II diabetes mellitus with a history of pancreatitis; a history of GERD; and hypertension. (Tr. 419). On examination, Dr. Fritzhand found that plaintiff's gait was normal and she could forward bend without difficulty. Range of motion studies were good. There were no joint abnormalities as neurological examination was completely normal and there was no evidence of nerve root damage as deep tendon reflexes were brisk and there was no evidence of muscle atrophy. He noted that plaintiff was right-hand dominant and that grasp strength and manipulative ability were well-preserved bilaterally. There was no clinical end-organ damage secondary to diabetes mellitus or hypertension. Dr. Fritzhand concluded that plaintiff appears capable of performing a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects and she has no difficulty reaching, grasping and handling objects. (Id.).

The ALJ gave the state agency reviewing physicians' assessment of plaintiff's physical functional capacity "significant consideration" because "relatively little medical evidence was submitted" after their review and the evidence that was submitted documented no significant

treatment, diagnostic test results or clinical signs. (Tr. 70). The ALJ gave "some weight" to Dr.

Fritzhand because he had seen plaintiff only one time in a non-treating context and plaintiff

exhibited largely normal clinical signs during the examination, which supported Dr. Fritzhand's

findings; however, the ALJ found Dr. Fritzhand's assessment was not very useful in formulating

an RFC statement because the regulations do not define the term "moderate amount." (*Id.*).

Plaintiff argues it was error for the ALJ to credit the assessments of the state agency

reviewing physicians over the opinion of her treating physician, Dr. Niehauser, because the

reviewing physicians did not consider the following evidence submitted after their review in

October 2014: (1) the records of treating psychiatrist Dr. Brian Masterson, M.D., who started

treating plaintiff in 2015 (Tr. 740-52); (2) Dr. Niehauser's fibromyalgia diagnosis; (3) a graded

exercise test during which plaintiff did not achieve the target heart rate due in part to leg pain (Tr.

717-18); and (4) Dr. Niehauser's December 2015 assessment. (Doc. 6 at 5, 11). Plaintiff alleges

that the ALJ "must consider the records submitted after" the nonexamining sources reviewed the

records. (*Id.* at 5, citing *Blakley*, 581 F.3d at 409). Plaintiff alleges that by accepting the

reviewing physicians' assessments which were based on only a portion of the record, the ALJ

improperly applied a more rigorous standard of review to the assessment of her treating physician

than he applied to the examining and reviewing physicians. Plaintiff further argues that the ALJ

erred by failing to incorporate limitations assessed by Dr. Fritzhand into the RFC finding.

Plaintiff has misconstrued the Sixth Circuit's holding in *Blakley.* The ALJ is not

necessarily prohibited from adopting a nonexamining medical source's opinion when that source

has not reviewed the entire record. *Kepke*, 636 F. App'x at 632 (citing *Blakley*, 581 F.3d at 409).

*Blakley* requires "only that before an ALJ accords significant weight to the opinion of a

28

non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record." *Id.* (quoting *Blakley*, 581 F.3d at 409). That is, "the record must give some indication that the ALJ subjected such an opinion to scrutiny." *Id.*

Here, the ALJ acknowledged that some medical evidence was submitted after the nonexamining physicians reviewed the record. (Tr. 70). However, the ALJ found that "relatively little medical evidence was submitted" after that date and the later evidence did not document "significant treatment, diagnostic test results or clinical signs." (Tr. 70). Plaintiff has not cited any evidence that calls the ALJ's finding into question. As discussed above, the ALJ rejected Dr. Niehauser's fibromyalgia diagnosis and December 2015 assessment for valid reasons which the ALJ thoroughly explained in his written decision. The exercise test result that was stopped due to leg pain was based on plaintiff's subjective complaint (Tr. 717-18) and therefore is of negligible significance. Finally, Dr. Masterson's treatment notes do not affect the assessment of plaintiff's physical functional capacity. Thus, it was not error for the ALJ to credit the nonexamining physicians' assessment of plaintiff's physical functioning despite their inability to review the entire medical record.

Nor did the ALJ err by failing to incorporate limitations assessed by the consultative examining physician, Dr. Fritzhand, into the RFC finding. Plaintiff argues that because the ALJ gave the opinions of the reviewing physicians "great weight," the ALJ was bound to account for Dr. Fritzhand's opinion that she is able to perform a "moderate amount of standing/walking and sitting/lifting" by including restrictions in the RFC finding limiting her to less than six hours of standing/walking in an 8-hour workday. (Doc. 6 at 5, citing Tr. 398). Plaintiff alleges that "a

moderate amount of sitting, standing and walking" is not the equivalent of four hours of standing or six hours of sitting. (Doc. 6 at 11).

Initially, the ALJ was not bound to fully credit Dr. Fritzhand's assessment. The ALJ stated that Dr. Fritzhand saw plaintiff only once, she "exhibited largely normal clinical signs" during the examination, and Dr. Fritzhand did not assess plaintiff's limitations in a function-by-function manner. (Tr. 70). These were valid reasons to give the opinion only "some weight." *See* 20 C.F.R. § 404.1527(c); *cf. Walters v. Comm'r of Soc. Sec.*, No. 1:14-CV-481, 2015 WL 1851451, at *11 (S.D. Ohio Apr. 22, 2015), (Report and Recommendation), *adopted*, 2015 WL 5693640 (S.D. Ohio Sept. 29, 2015) (citing *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007) (noting that a treating doctor's general findings were relevant on the issue of whether the claimant's RFC permitted her to work, but they were not controlling absent a functional capacity assessment)).

The ALJ is vested with the responsibility for assessing a claimant's functional capacity based on the relevant medical and other evidence. 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(3), 404.1546. The relevant evidence here included the assessment of the state agency reviewing physicians, who considered Dr. Fritzhand's examination findings (Tr. 123) and opined that plaintiff could lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently; stand/walk approximately four hours in an eight-hour workday; and sit approximately six hours in an eight-hour workday. (Tr. 124-125). The ALJ was not required to incorporate any specific restrictions into the RFC finding to account for Dr. Fritzhand's findings, which did not include a functional capacity assessment.

Plaintiff has not shown that the ALJ erred by failing to fully account for her physical impairments and resulting limitations in the RFC finding or to explain the reasons for his finding. The ALJ thoroughly evaluated the medical evidence related to plaintiff's physical functional capacity prior to the date last insured, including the medical opinions of the examining and reviewing physicians, and explained his reasons for including functional restrictions consistent with their assessments in the RFC. Plaintiff has not shown that the evidence before the ALJ required the inclusion of greater limitations than those found by the ALJ.

ii.     **Psychological assessments**

Plaintiff argues that the ALJ erred by crediting the assessments of the state agency reviewing psychologists and failing to incorporate restrictions into the RFC finding to account for mental limitations assessed by the consultative examining psychologist, Dr. David Chiappone, Ph.D. (Doc. 6 at 5-7). Plaintiff alleges this was error because the reviewing psychologists gave "great weight" to Dr. Chiappone's assessment. (*Id.* at 5, citing Tr. 140). Plaintiff also alleges that the ALJ erred by giving greater weight to the reviewing psychologists' assessments because they did not have the records of treating psychiatrist Dr. Masterson before them. (*Id.*, citing Tr. 740-52).

Dr. Chiappone evaluated plaintiff for disability purposes in June 2014. (Tr. 428-36). Plaintiff reported that she left her position as an assistant manager in June 2013 after 30 days because there was a "lot of drama there," and she had left her previous job after 90 days because she anticipated they were going to let her go. (Tr. 429). She worked at her job prior to that for 3 ½ years. She said she missed work "a lot" starting when she was 18 because of depression depending on "when there was stress." She attended work as needed and related adequately to

31

her bosses and coworkers, but she was let go from one job because she did not get along with the manager. Plaintiff reported that she relates to the general public "[g]reat." (Tr. 430). Plaintiff reported she had received outpatient mental health treatment since she was about 19 years old. (Tr. 431). Plaintiff reported she had a herniated disc in her neck and degenerative disc disease in her back but said "she did not have any pain currently." (Tr. 431). She sat cross legged during the evaluation and did not exhibit any pain behavior.

On mental status examination, Dr. Chiappone found plaintiff's flow of conversation and thought were normal. (Tr. 432). She did not appear to be depressed; she had average energy and good eye contact; her affect was appropriate; and she reported suicidal ideation but denied any attempts and reported she was not suicidal currently. She did not show behavioral signs of anxiety during the exam, but she reported having a month-long episode of agoraphobia one year earlier and panic attacks a couple of times per year. Her mental content was normal, she was oriented in all spheres, and insight and judgment were adequate. (Tr. 433-34).

Plaintiff reported she lived in a house with her daughter, son and boyfriend. (Tr. 434). On a typical day she wakes up about 10:00 to take the dogs out and feed them, she attends to her self-care, and she does chores which include cooking, dishes, cleaning the floor, and laundry, which she does as needed. She can do yard work. She can manage funds. She grocery shops but needs to have someone with her because she becomes anxious. She fishes on the weekends and had fished the prior weekend with her boyfriend. She watches television, likes to read, and uses a computer and reported she can focus on these activities, although she has to reread information at times to remember it. She has contact with family members but does not socialize with friends. She drives on a daily basis.

Dr. Chiappone made "suggested" diagnoses of major depressive disorder, panic attacks, and agoraphobia and assessed plaintiff's mental abilities as follows:

- Understanding, remembering and following instructions: She may have some difficulty remembering information. On the mental status examination she remembered 0 of 3 objects with interference and 4 digits forward. Otherwise her memory appeared to be adequate. Plaintiff was able to understand, remember and follow instructions in the mental status exam.

- Maintaining concentration, attention, persistence and pace to perform simple and multi-step tasks: Plaintiff may have some difficulty maintaining attention and concentration. Plaintiff could focus on only 3 digits backward, but otherwise her concentration and attention were adequate in the mental status exam. She was able to maintain concentration and attention in the interview, she did not appear to be distracted, and she could focus to follow the conversation in the evaluation.

- Ability to relate to supervisors and co-workers in the work setting: She would have some difficulty dealing with co-workers and supervisors and she might overreact to constructive criticism on a job. She interacted adequately in the evaluation. She reported that she could relate to others when she was working except that she had difficulty dealing with one manager; she had difficulty dealing with "drama" at her last job; she can interact with the general public; at times she cannot leave the house because of anxiety; and she had some anger problems in the past when she was criticized.

- Ability to tolerate stress at a work site: Plaintiff would have difficulty dealing with stress on a job. Plaintiff reported she would get depressed when work was stressful. She is of low-average to average intellectual functioning and has some internal resources to help her deal with stress and demands.

(Tr. 435-36).

Non-examining state agency psychiatrist Ermias Seleshi, M.D., reviewed the record in June 2014 and completed an assessment. (Tr. 121-28). Dr. Seleshi gave "great weight" to Dr. Chiappone's opinion. (Tr. 123-24). Dr. Seleshi assessed mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration. (Tr. 122). Dr. Seleshi opined that plaintiff would have difficulty with

detailed or complex instructions but she retains the ability to understand, recall and follow simple 1-3 step instructions to complete familiar, routine and repetitive tasks; she could perform familiar routine tasks in a setting without expectations for a sustained pace or concentration, high productivity demands, or meeting strict deadlines; she can interact with coworkers and supervisors on a brief, intermittent and superficial basis; and she should have no more than occasional work-related contact with the general public. (Tr. 126-27). On reconsideration in October 2014, Dr. Robyn Hoffman, Ph.D., affirmed Dr. Seleshi's assessment (Tr. 132-45) and added that plaintiff would "function best in a solitary assignment without involvement in collaborative work." (Tr. 144).

The ALJ gave "significant consideration" to the state agency reviewing psychologists' assessments finding that plaintiff was able to "understand, recall and follow simple, one to three-step instructions to complete familiar, routine and repetitive tasks"; she could "work in a s[e]tting without expectations for sustained pace or concentration, high productivity demands or strict deadlines"; she "could interact with coworkers and supervisors on a brief, intermittent and superficial basis and could tolerate only occasional work-related contact with the general public but would work best alone"; and she "could work in a low-stress setting with clear and predictable expectations without frequent changes." (Tr. 72, citing Tr. 126-28, 142-45). The ALJ acknowledged that the reviewing mental health sources did not consider plaintiff's recent treatment with Dr. Masterson, but the ALJ found that they considered most of the mental health treatment records. (Tr. 73). The ALJ stated he was giving the reviewing psychologists' opinions the most weight because they specified how plaintiff's "psychological functioning would affect [her] work-related abilities," whereas other sources indicated only that plaintiff would have "some

34

difficulty" in these areas or provided GAF scores. (*Id.*). The ALJ gave Dr. Chiappone's assessment "some weight" because he saw plaintiff only once and did not treat plaintiff; his evaluation provided little insight into plaintiff's capabilities because he did not specify what he meant by "some difficulty"; and evidence showing that plaintiff had been in mental health counseling for a brief period and the effectiveness of her psychotropic medications demonstrated that plaintiff would not face debilitating psychological limitations. (*Id.*).

Plaintiff alleges that the ALJ erred in weighing the mental health sources' opinions because even though the ALJ credited the reviewing psychologists' assessments and they in turn gave "great weight" to Dr. Chiappone's opinion, the ALJ did not incorporate specific work-related limitations found by Dr. Chiappone into the RFC finding. (Doc. 6 at 6-7). Plaintiff alleges the ALJ failed to adopt the following limitations found by Dr. Chiappone: (1) "some difficulty with attention and concentration" (Tr. 435); (2) "some difficulty with supervisors and coworkers in sustaining work," particularly in light of alleged problems leaving the house (Tr. 436); and (3) "some problems with stress" (Tr. 436). (Doc. 6 at 6-7). In fact, though, the ALJ found that plaintiff has some, or "moderate," difficulties with regard to concentration, persistence or pace and in social functioning, noting that she complained that she struggles to get along with friends and coworkers. (Tr. 65). The ALJ imposed the following limitations in the RFC finding to account for plaintiff's mental limitations in these and other areas of functioning:

> She can perform simple, routine tasks. She cannot perform at a production-rate pace, such as generally associated with jobs like assembly line work, but can perform goal-oriented work, such as generally associated with jobs like office cleaner. She can have no fast-paced work. She can make simple, work-related decisions. She is limited to occasional and superficial interaction with supervisors, coworkers and the public. She can tolerate occasional changes in a routine work setting.

(Tr. 66). Plaintiff has not identified additional limitations assessed by Dr. Chiappone that the ALJ failed to adopt and incorporate into the RFC finding. Thus, plaintiff's argument that the ALJ erred by failing to adopt restrictions assessed by Dr. Chiappone, despite indirectly crediting his opinion, is without merit.

Plaintiff also alleges that the ALJ failed to account for the following limitations assessed by the state agency reviewers: moderate limitations in attention and concentration for extended periods in completing a normal workday and week, no sustained pace on a job, and "solitary assignment" versus collaborative work. (Tr. 143-44). Plaintiff has not developed this argument either legally or factually. She has not explained why the following restrictions in the RFC finding do not sufficiently incorporate these limitations: "simple, routine tasks" that are not performed "at a production-rate pace," are not "fast-paced," involve only "simple, work-related decisions," "occasional and superficial interaction" with others, and "occasional changes in a routine work setting." (Tr. 66). Plaintiff has therefore waived this argument. *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (a plaintiff's failure to develop an argument challenging an ALJ's non-disability determination amounts to a waiver of that argument); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

For these reasons, plaintiff's first assignment of error should be overruled.

#### 4. The ALJ's evaluation of plaintiff's subjective complaints

Plaintiff alleges as her fifth assignment of error that the ALJ erred in evaluating her subjective complaints under 20 C.F.R. § 404.1529, SSR 96-7p[5] and 16-3p. (Doc. 6 at 15-16). Defendant argues that the ALJ's evaluation of plaintiff's symptoms is supported by the objective medical and other evidence of record and therefore must be upheld under 20 C.F.R. § 404.1529(c) and SSR 16-3.

The SSA rescinded SSR 96-7p and replaced it with SSR 16-3p, which is applicable to agency decisions issued on or after March 28, 2016. SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). SSR 16-3p therefore applies to the ALJ's decision here, which was issued on April 18, 2016. SSR 16-3p eliminates "the use of the term 'credibility'" from the SSA's sub-regulatory policy and clarifies that "subjective symptom evaluation is not an examination of an individual's character." *Id*. Under SSR 16-3p, "an ALJ must focus on the consistency of an individual's statements about the intensity, persistence and limiting effects of symptoms, rather than credibility." *Rhinebolt v. Commr. of Soc. Sec.*, No. 2:17-CV-369, 2017 WL 5712564, at *8 (S.D. Ohio Nov. 28, 2017) (Report and Recommendation), *adopted*, 2018 WL 494523 (S.D. Ohio Jan. 22, 2018).

The regulations and SSR 16-3p describe a two-part process for evaluating an individual's statements about symptoms, including pain. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other

---

[5] As discussed *infra*, SSR 96-7p has been superseded by SSR 16-3p and does not apply here.

evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.   20 C.F.R. § 405.1529(c); SSR 16-3p, 2017 WL 5180304, at *3-8.

The ALJ properly evaluated plaintiff's subjective complaints in accordance with 20 C.F.R. § 405.1529(c) and SSR 16-3p.   The ALJ determined that plaintiff had medically determinable physical and mental impairments that could reasonably be expected to cause her alleged symptoms.   (Tr. 67).   However, the ALJ found that plaintiff's statements as to the intensity, persistence and limiting effect of those symptoms were not entirely consistent with both the objective medical evidence and other evidence of record.   In making his determination, the ALJ thoroughly evaluated and relied on: (1) the lack of supporting objective medical evidence; (2) the conservative treatment plaintiff had received; (3) plaintiff's history of irregular mental health treatment; (4) whether plaintiff used any measures other than medication to relieve her pain or symptoms; (5) plaintiff's daily activities; and (6) the subjective complaints and allegations plaintiff made to the treating and examining medical sources.   (Tr. 66-74).   These factors substantially support the ALJ's finding that plaintiff's allegations regarding her symptoms were not entirely consistent with the medical and other evidence of record.

First, the record supports the ALJ's finding that the objective medical evidence was not fully consistent with plaintiff's allegations related to her symptoms.   Plaintiff alleges that imaging results and examination findings support her complaints about sitting and standing for an extended

38

period of time and difficulty using her hands (Tr. 101-102), and a "positive exercise test in 2014 with leg pain" is objective evidence that supports her complaints (Tr. 717-18). (Doc. 6 at 15-16). The ALJ noted that diagnostic imaging performed in 2013 disclosed only "mild" degenerative disc disease and "mild" disc herniations of the lumbar spine (Tr. 370) and small disc protrusions and "mild" stenosis in the cervical spine (Tr. 372). The ALJ also found that "unremarkable" clinical findings are consistently documented in the record, including findings of symmetrical strength, a full range of motion in the extremities, normal gait, normal range of motion of the head and neck, and only slightly diminished range of motion during straight leg raise test. (Tr. 68, citing Tr. 310-312, 6/28/13 emergency room visit; Tr. 317, 10/2013 neurosurgeon consult; Tr. 413-21, 4/2014 consultative evaluation). The ALJ reasonably found that this objective evidence did not corroborate plaintiff's allegations of debilitating neck, leg and back pain that "leaves her bedridden most of the day" and significantly curtails her endurance. (Tr. 67-68).[6] Additional imaging results from 2013 that showed "severe degenerative change in the disc with disc narrowing and spurring" at C5-C6 (Tr. 319) do not substantiate plaintiff's allegations of debilitating pain that leaves her essentially bedridden. Further, although plaintiff alleges that her psychological evaluations document depression (Tr. 428-36, 740-52), the ALJ found that clinical evidence of depression and anxiety was lacking. (Tr. 69, citing Tr. 428-32, 6/2014 psychological consultative evaluation). Plaintiff has not cited objective medical evidence in the record that documents debilitating depression or anxiety and shows that the ALJ's finding is unsupported.

Plaintiff states that a lack of objective evidence alone cannot properly be used as a basis to discount her complaints. (Doc. 6 at 15). However, the ALJ did not rely on a lack of objective

_____

[6] Plaintiff testified that lying down alleviates her back pain and she spends much of the day in bed. (Tr. 67, 93-94).

evidence as the sole reason for finding that plaintiff's subjective allegations were not fully consistent with the evidence. The ALJ also considered the fact that plaintiff had been treated with conservative measures. (Tr. 68). Specifically, the treatment for her orthopedic conditions and pain consisted of medications only, including hydrocodone-acetaminophen, and there was no indication that plaintiff had pursued epidural injections for arm pain as contemplated in late 2015. (*Id.*, citing Tr. 672, 704). Plaintiff reported to various medical providers that hydrocodone-acetaminophen and muscle relaxers effectively controlled her pain. (*See* Tr. 68, citing Tr. 417, 669, 677, 704). The ALJ properly relied on the pain and symptom control plaintiff achieved through medication to find her subjective physical complaints were not fully corroborated by the evidence of record. *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017). The ALJ likewise reasonably relied on evidence that plaintiff's mental health symptoms were successfully managed with psychotropic medications such as Xanax to find that her allegations of debilitating depression and anxiety were not consistent with the evidence.

Plaintiff appears to argue that the ALJ failed to consider the side effects of her medications by alleging the ALJ "erred on her medications," which she claims have the side effect of making her tired. (Doc. 6 at 15). Plaintiff alleges that she takes medications for pain, diabetes and "her nerves" which cause her to be tired and which would negatively affect her ability to do light or sedentary work 40 hours each week. (*Id.* at 15-16). However, plaintiff cites to only a handful of subjective complaints to support her allegation that the side effects of her medications would preclude her from performing work at any exertional level on a sustained basis. (*Id.*, citing Tr. 270- 12/2013 Adult Function Report; Tr. 274, plaintiff's disability appeal report, Tr. 589, 10/2013 treatment record; Tr. 747, 7/2015- plaintiff reportedly stopped taking Trazadone because it made

her feel "too druggy"; Tr. 741, 3/2016 treatment note reporting plaintiff's complaint that she was very sleepy during the day).   Plaintiff does not point to any medical or other evidence that corroborates her subjective complaints of tiredness.   Thus, the ALJ did not err by failing to take the side effects of plaintiff's medications into account when determining whether her subjective allegations were consistent with the evidence.

The ALJ also found that plaintiff engaged in activities that were not consistent with her allegations of debilitating impairments.   (Tr. 65, 70).   Plaintiff contends the ALJ erred by finding her allegations of pain and other symptoms were inconsistent with her daily activities because she "can sit and do these at home and also does these when able."   (*Id*. at 15, citing Tr. 68-70). Plaintiff has not shown the ALJ committed any error in this regard.   An ALJ may "consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments."   *Keeton v. Comm'r of Soc. Sec*., 583 F. App'x 515, 532 (6th Cir. 2014) (citing *Walters*, 127 F.3d at 532; *Blacha v. Sec. of Health & Human Servs*., 927 F.2d 228, 231 (6th Cir. 1990) ("[A]n ALJ may consider household and social activities in evaluating complaints of disabling pain.")).   The record substantially supports the ALJ's finding that plaintiff engaged in activities that were not consistent with her allegations of debilitating physical and mental impairments, including job hunting in May 2014 (Tr. 422), fishing as recently as June 2014 (Tr. 434), taking a trip to Florida and going deep sea fishing around February of 2016 (Tr. 98), and taking weekly trips to the casino with friends (Tr. 99), which the ALJ found undermined her allegations of panic attacks in public environments.   (Tr. 65, 70).

Finally, plaintiff argues that the ALJ "erred with regard to the third-party statement" of Bruce Getha, by taking the statement out of context and finding him to be a "biased" source.

(Doc. 6 at 16). Plaintiff questions how Getha could be biased since the SSA sent the form to him for completion. However, plaintiff has not shown that the ALJ's consideration of Getha's statement was in error. The ALJ gave the December 2013 report completed by Getha, plaintiff's friend and roommate, "some weight." (Tr. 73, citing Tr. 247, 249). The ALJ found that Getha was not a "disinterested" party and that his statements were biased in favor of a disabled finding because plaintiff resides in his household. (Tr. 74). The ALJ found that Getha's report corroborated plaintiff's allegations in some respects, but the report also showed that plaintiff remained capable of performing some work activities. (Tr. 73-74). Plaintiff does not explain how the ALJ took Getha's statement out of context, and there is no indication that the ALJ rejected the information Getha submitted based simply on a finding of bias.

Plaintiff has not shown that the ALJ erred in evaluating her subjective complaints. Plaintiff's fifth assignment of error should be overruled.

### 5. The alleged errors at step five

Plaintiff alleges as her sixth assignment of error that the ALJ erred at step five of the sequential evaluation process by relying on an improper hypothetical question. (Doc. 6 at 16-17). Plaintiff alleges that in posing the hypotheticals to the VE, the ALJ failed to account for "limitations due to the neck and arm impairments, focusing down to work and using the hands and arms to do light work for 40 hours a week"; moderate limitations on sitting and standing assessed by Dr. Fritzhand; the work-related limitations of Dr. Chiappone; "the supported limitations of Dr. Niehauser at Tr. 722-24"; and the "moderate limitations on concentration, persistence or pace which he later found at Tr. 65." (Doc. 6 at 16-17).

42

Plaintiff has not cited any legal authority in support of her fifth assignment of error. Nor has plaintiff sufficiently articulated the precise restrictions that the ALJ omitted from the hypothetical to the VE. Further, plaintiff has failed to cite portions of the record that support the broad restrictions she has listed under this assignment of error. Plaintiff has therefore waived her sixth assignment of error by failing to develop the argument either factually or legally. Plaintiff's sixth assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 6/21/18

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

PAULA VOELLGER,
  Plaintiff,

 vs.

COMMISSIONER OF
SOCIAL SECURITY,
  Defendant.

Case No. 1:17-cv-437

Black, J.

Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.   Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.   If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.   A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.   Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).